UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

STICHTING PENSIOENFONDS ZORG EN WELZIJN,

Plaintiff,

v.

DUNMORE CAPITAL, LLC, SIDNEY D. DUNMORE,
JEREMY A. DUNMORE and S&J COMPANY LLC,

Defendants.

Civil Action No. 09-_____

## COMPLAINT

Plaintiff Stichting Pensioenfonds Zorg en Welzijn ("PfZW" or "Plaintiff"), by its

attorneys, Pepper Hamilton LLP and Bingham McCutchen LLP, as and for its complaint, alleges

as follows:

### The Nature of the Case

1.     This is an action for breach of contract, for breach of fiduciary duty, for

unjust enrichment and for related claims arising out of a business transaction between PfZW, a

Dutch pension fund, and defendant Dunmore Capital, LLC ("Dunmore Capital"), acting through

its managers, defendants Sidney D. Dunmore ("Sidney") and Jeremy A. Dunmore ("Jeremy"),

and various other defendant entities managed, owned or controlled by Sidney and Jeremy.[1]  As a

result of Defendants' actions described below, PfZW's investment of approximately $15 million

has been completely squandered in transactions which provided no benefit at all to the fund in

---

[1]     Sidney and Jeremy are sometimes collectively referred to herein as the "Dunmores."  The defendants are
sometimes collectively referred to herein as the "Defendants."

which PfZW was an investor, but which provided enormous financial benefit to Sidney and Jeremy, and to other entities managed, owned and/or controlled by them.

2.     In short, as is further set forth below, the Dunmores knowingly and intentionally took the $15 million PfZW invested with them and, rather than apply it towards the mutual benefit of PfZW and the Dunmores, as required by the parties' agreements and the Dunmores' fiduciary duties, the Dunmores used the PfZW's money to pay off debts and obligations owed by companies which they managed, owned and/or controlled.  Throughout their dealings with the PfZW, the Dunmores acted deceitfully and dishonestly, and in violation of law.  As a direct result of the Dunmores' unlawful conduct, PfZW has suffered damages in the amount of more than $15 million.

3.     In September 2007, PfZW invested money with the Dunmores by purchasing 4.9 units of DC Fund I Feeder, LLC (the "Feeder Fund") pursuant to a private placement memorandum (PPM) issued by the Feeder Fund.  Each unit of the Feeder Fund was priced at $5,000,000; thus, PfZW's total commitment to the Feeder Fund was $24,500,000.  According to the PPM, the managing member of the Feeder Fund was defendant Dunmore Capital.  At the same time, and in accordance with the PPM, Dunmore Capital formed a Delaware limited partnership (Dunmore Capital Fund, L.P. (the "Capital Fund")).  The principal purpose of the Capital Fund was to purchase farmland in northern California and to improve it by arranging for the rezoning of the property for residential and/or commercial use.  The principal purpose of the Feeder Fund was to supply capital funds to the Capital Fund so that it could purchase investment property.

4.     The agreements governing the Capital Fund and the Feeder Fund (collectively, the "Funds") contained numerous provisions designed to ensure, among other things, (a)

that the Funds made only investments that met specified investment guidelines; (b) that PfZW's investment in the Funds was not adversely impacted by any conflicts of interest to which Dunmore Capital might be subject; and (c) that PfZW received timely and accurate financial reports regarding the use, application and status of the money it invested in the Funds.

5.      Notwithstanding these protections -- and in clear violation of them -- Dunmore Capital (acting through its managers, the Dunmores) exercised its authority as general partner of the Capital Fund to employ the Capital Fund's assets to purchase options (instead of fee title) on properties from entities that are themselves managed, owned and/or controlled by the Dunmores.  The purchases of these options were gross violations of the general partner's stated investment strategy of reducing risk to invested capital (as set forth in the PPM).  The options were acquired at grossly inflated prices, in complete violation of the investment guidelines to which Dunmore Capital was subject.  Moreover, at the time the options were acquired, each of the optioned properties carried a heavy debt load and, in more than one case, the borrowers who owned such optioned properties had already been declared by their lenders to be in default of their financial obligations.

6.      Additionally, despite its significant conflicts of interest, Dunmore Capital (acting through the Dunmores themselves, as its managers) secretly and without the required approval[2] amended the option agreements entered into by Dunmore Capital (on behalf of the Capital Fund) to provide that the Capital Fund's investment could be applied to service the properties' debts, taxes, insurance and other fees associated with their underlying debts, *without any*

---

[2]      The Fund's governing documents required Dunmore Capital, prior to making any decision or taking any action in any transaction or matter that may give rise to a conflict of interest between Dunmore Capital (or affiliates entities or individuals) and the Fund, to seek and obtain the approval of an advisory committee that included a PfZW representative as a member.

*credit towards the ultimate acquisition price of the properties.*

7.    These reckless and irresponsible transactions were undertaken by Dunmore Capital (as general partner of the Capital Fund) and by the Dunmores (as managers of Dunmore Capital), without informing PfZW of the terms of the agreements (especially including the terms which placed the Capital Fund's investment at significant risk of loss without any corresponding benefit) until months after the transactions were completed -- and, then, only after numerous demands by PfZW for information which the general partner was required to provide to PfZW as a matter of course under the governing documents, without request.  Because Dunmore Capital failed to provide PfZW with the timely financial reports and other information required pursuant to the agreements governing the Capital Fund and the Feeder Fund, PfZW only learned about the reckless and self-dealing options long after the damage had already been done and the Capital Fund's money had been wasted.

8.    As a result of the actions specifically described below, Dunmore Capital -- aided and abetted by its managers, the Dunmores -- breached its agreements with PfZW and breached its fiduciary duties to PfZW, resulting in the total loss of PfZW's $15 million investment in the Funds.  By contrast, the Dunmores themselves were unjustly enriched by Dunmore Capital's actions, to the substantial detriment of PfZW.  PfZW is entitled to judgment in the amount of its damages suffered as a result of Defendants' conduct.

9.    The Defendants concealed their actions from PfZW by means of misrepresentations, misstatements, omissions and other fraudulent acts, as further described below.

10.    As general partner of the Capital Fund, Dunmore Capital has a fiduciary obligation to protect and maximize the value of the Capital Fund's assets, to avoid any waste of those assets and to protect the interests of limited partners such as PfZW.

## The Parties[3]

11.     Plaintiff PfZW, formerly known as Stichting Pensioenfonds voor de Gezondheid, Geestelijike Maatschappelijke Belangen ("PGGM"), is a pension fund organized under the laws of The Netherlands, with its principal offices located in Zeist, The Netherlands.

12.     Defendant Dunmore Capital is a limited liability company organized under the laws of Delaware, with its principal place of business located at 2251 Douglas Boulevard, Suite 115, in Roseville, California.   The sole member of Dunmore Capital is defendant S&J Company, LLC, a Delaware limited liability company.

13.     Defendant Sidney D. Dunmore is a resident of the State of California and, at all relevant times, was (a) a manager and controlling principal of Dunmore Capital, as a result of his position as manager of S&J Company, LLC; (b) a manager and controlling principal of Dunmore Land Development, LLC, a Delaware limited liability company, as a result of his position as manager of S&J Land Development, LLC (a Delaware limited liability company), which is the sole member of Dunmore Land Development, LLC; (c) a manager and controlling principal of the Feeder Fund; (d) a manager and controlling principal of the option-purchasing special purpose entities (collectively, the "SPEs") referenced herein which are owned and controlled by Dunmore Capital; and (e) a manager and controlling principal of one or more of the property-owning entities referenced below, from which Dunmore Capital (through the SPEs) acquired options.

14.     Defendant Jeremy A. Dunmore is a resident of the State of California and, at all relevant times, was (a) a manager and controlling principal of Dunmore Capital, as a result

---

[3]      An organizational chart of the various Dunmore entities referenced in this complaint is annexed hereto as Exhibit A.

of his position as manager of S&J Company, LLC; (b) a manager and controlling principal of

Dunmore Land Development, LLC, a Delaware limited liability company, as a result of his posi-

tion as manager of S&J Land Development, LLC, a Delaware limited liability company, which is

the sole member of Dunmore Land Development, LLC; (c) a manager and controlling principal

of the Feeder Fund; (d) a manager and controlling principal of the option-purchasing SPEs refer-

enced herein which are owned and controlled by Dunmore Capital; and (e) a manager and con-

trolling principal of one or more of the property-owning entities referenced below, from which

Dunmore Capital (through the SPEs) acquired options.

     15.    Defendant S&J Company, LLC ("S&J Company"), is a Delaware limited

liability company with its principal place of business located at 2251 Douglas Boulevard, Suite

115, in Roseville, California.  The two members (and managers) of S&J Company are Sidney

and Jeremy.

## Jurisdiction

     16.    This Court has original jurisdiction over the action pursuant to 28 U.S.C.

§ 1332(a) because the parties are diverse and the amount in controversy exceeds $75,000.00, ex-

clusive of interest and costs.

## The Facts

A. Establishment of the Dunmore Capital Fund, L.P.

     17.    In September 2007, pursuant to the PPM, the Dunmores solicited invest-

ments in a fund.  Using capital committed by limited partners and the Dunmores' expertise in

arranging for the necessary permits, zoning and other entitlements required for development of

real property in northern California, it was the fund's strategy to acquire parcels of undeveloped

real estate located in and around the city of Sacramento, California, to prepare the properties for

development by securing the necessary zoning and other permits and then to sell the permitted properties to real estate developers.

18.      In furtherance of their business plans, the Dunmores established the Capital Fund and the Feeder Fund.  The Capital Fund was created by an Agreement of Limited Partnership of Dunmore Capital Fund, L.P. (the "LPA"), dated September 21, 2007.[4]  Pursuant to the LPA, Dunmore Capital serves as the general partner of the Capital Fund; the limited partners of the Capital Fund are Dunmore Capital (which holds a 5.7% interest in the Capital Fund) and the Feeder Fund (which holds a 94.3% interest in the Capital Fund).

19.      The Feeder Fund was created by a Limited Liability Company Agreement of DC Fund I Feeder, LLC (the "Feeder Fund Agreement"), also dated September 21, 2007.[5] The managing member of the Feeder Fund is Dunmore Capital; the remaining two economic members of the Feeder Fund are PfZW (which holds a 49% interest in the Feeder Fund) and Dunmore Land Development, LLC ("Dunmore Land," which holds a 51% interest in the Feeder Fund).  (*See* organizational chart annexed hereto as Exhibit A.)

20.      As contemplated in the PPM (*see* PPM, at 1), PfZW (a foreign institutional investor) elected to invest in the Capital Fund through the Feeder Fund in order to preserve certain tax advantages available to it under the United States tax laws.  To ensure that members of the Feeder Fund possessed the same rights as limited partners in the Capital Fund, the PPM represented -- and the LPA expressly provided -- that members of the Feeder Fund "shall be third-party beneficiaries of [the LPA] to the same extent of the rights of Limited Partners" of the

---

[4]   A copy of the LPA is annexed hereto as Exhibit B.

[5]   A copy of the Feeder Fund Agreement is annexed hereto as Exhibit C.

LPA (LPA, § 12.17).

21.     In accordance with the Feeder Fund Agreement, and in response to draw-
down notices received from Dunmore Capital (in its capacity as general partner of the Capital
Fund and/or as managing member of the Feeder Fund), on or about September 28, 2007, PfZW
made an initial investment of $388,717.27 in the Feeder Fund.   Subsequently, in response to
drawdown notices received from Dunmore Capital (whether in its capacity as general partner of
the Capital Fund or as managing member of the Feeder Fund), PfZW contributed an additional
$14,502,875.26 to the Feeder Fund, for a total investment of $14,891,592.53.

22.     Although Dunmore Land, as the sole other economic member of the
Feeder Fund, was also required to make capital contributions to the Feeder Fund in response to
the drawdown notices received from Dunmore Capital, PfZW was never provided with sufficient
information concerning the financial affairs of the Funds to be able to confirm that Dunmore
Land actually made the contributions it was required to make.  Indeed, upon information and be-
lief (including an admission made by the Dunmores' former chief financial officer to a represen-
tative of PfZW in the presence of other witnesses), the Dunmores fraudulently applied capital
actually contributed by PfZW to credit the capital account of Dunmore Land.

B.    The Capital Fund's Acquisition of Options to Purchase Properties
      and Its Violation of the LPA and Breach of Its Fiduciary Duty to PfZW

23.     Pursuant to the LPA, the investments to be acquired by the Capital Fund
were to be selected by Dunmore Capital, as general partner, in accordance with specific invest-
ment guidelines (the "Investment Guidelines") expressly included in the LPA.

24.     The LPA also identified several properties as so-called "Initial Invest-
ments" for the Capital Fund, and provided that those properties could be (but were not required
to be) acquired for the acquisition prices (specifically including "warehousing costs") identified

on a schedule to the LPA.  Each of the Initial Investment properties identified in the LPA was (and, upon information and belief, to the extent not subsequently foreclosed by its lenders, remains) owned by an entity which was (and is), in turn, managed, owned or controlled by the Dunmores.  It was the parties' intention and understanding at the time they entered into the LPA and the Feeder Fund Agreement that the Capital Fund would acquire fee simple interests in some or all of the Initial Investment properties, provided that they remained suitable investments for the Capital Fund.

25.     Notwithstanding the intention and understanding of the parties, Dunmore Capital did not acquire fee simple interests in the Initial Investment properties but, instead, between September 2007 and February 2008 caused the Capital Fund to create seven wholly-owned California limited liability companies as special purpose entities (SPEs),[6] and each newly-created SPE -- controlled by Dunmore Capital, as sole general partner of the Capital Fund -- then acquired an option to purchase a parcel of real property (collectively, the "Optioned Properties") at a fixed price.

26.     Five of the seven Optioned Properties were (and, upon information and belief, to the extent not subsequently foreclosed by its lenders, remain) owned by an entity which is, in turn, managed, owned and/or controlled by one or both of the Dunmores.  Each Optioned Property was (and, upon information and belief, to the extent not subsequently foreclosed by its lenders, remains) encumbered with substantial debt and/or liens for delinquent property taxes.

27.     Each of the purchase options was memorialized in an option agreement

_____

[6]      The seven SPEs formed by Dunmore Capital on behalf of the Capital Fund are: Vacaville Midway 186 Holdings, LLC; Vacaville Land 28 Holdings, LLC; Vacaville Vicenza 130 Holdings, LLC; Vacaville Hickman 38 Holdings, LLC; Madison Community 214 Holdings, LLC; Vacaville 140 Holdings, LLC; and Madison 80 Holdings, LLC.  The Capital Fund is the sole member of each of the seven SPEs.

entered into between an SPE (acting through its sole member, the Capital Fund, which itself acted through its general partner, defendant Dunmore Capital) and (in all but two cases) the Dunmore-managed and controlled entity which owned the Optioned Property. The original option agreements entered into between the SPEs and the property owners provided that the option consideration would be applied against the ultimate purchase price of the property, should the option-holder exercise its option.

28.     Each of the option agreements provided that the option consideration was to be held in escrow, but this provision was totally ignored and no escrow agent was ever appointed. Moreover, the Dunmores never publicly recorded the option agreements -- thus subjecting the option purchasers (and, through them, the Capital Fund) to substantial additional legal risk.

29.     Although -- for the reasons set forth below -- these option transactions alone violated the terms of the LPA and constituted breaches of Dunmore Capital's fiduciary duty to the Capital Fund and PfZW, as a limited partner in the Capital Fund, the Dunmores thereafter secretly amended the option agreements to further advance their own interests at the expense of the Capital Fund and PfZW.

30.     In March 2008, the SPEs and the property-owning entities (again, with the Dunmores acting on both sides of the transactions) entered into addenda to each of the seven original option agreements. The addenda to the option agreements permitted the property-owners to use the option consideration paid by the SPEs to service the outstanding debt on their respective properties, and to pay property taxes, insurance and other fees associated with maintenance of the debt on the properties, *without any credit being given to the SPE towards the purchase price of the property*. In other words, although the Capital Fund did not own any of the

optioned properties and had no prior obligation whatsoever to service the debt on any of those properties, Dunmore Capital (acting through its managers, the Dunmores) expended the Capital Fund's assets to reduce the financial obligations of third parties -- significantly, in this case, third parties managed, owned and/or controlled by the Dunmores themselves. This expenditure of Capital Fund assets did not benefit the Capital Fund; it did, however, provide a significant bene-fit to the Dunmores.

31.    Although Dunmore Capital created the SPEs and entered into the self-dealing option agreements with the property-owning entities in September 2007 through Febru-ary 2008, Dunmore Capital concealed this information from PfZW until March 2008, when it revealed for the first time that it had caused the Capital Fund -- through the SPEs -- to acquire options in the Initial Investment properties instead of fee simple title. It wasn't until July 2008, however, that PfZW learned of the perfidious addenda to the option agreements -- four months after the addenda had been executed; at that time, the Dunmores could no longer fend off PfZW's persistent demands for information regarding its investment, including a response to PfZW's inquiry as to why the Capital Fund was paying debt service on obligations of other enti-ties.

32.    Upon information and belief, the Dunmores -- by virtue of their positions as managers and controlling principals of the property-owing entities and as managers and con-trolling principals of Dunmore Capital -- knew that the property-owning entities could not ser-vice their debt or pay their property taxes. They conspired, in violation of the LPA and in breach of Dunmore Capital's fiduciary duty to PfZW, to use the Capital Fund's assets for the benefit of other entities managed, owned and/or controlled by them, without any corresponding benefit to the Capital Fund and PfZW.

33.     Each of the option agreements entered into between the SPEs and the Dunmore-managed and controlled property owners[7] (even as amended) provided the SPEs with the right to have their initial option payments returned if (a) during a "feasibility period," the option holder determined that the property under option is "unsuitable," and (b) if there were inaccuracies in the property-owners' representations and/or warranties contained in the option agreements.

34.     Section 4.1.2 of the option agreements (even as amended) provided that the option holder may, during the specified "feasibility period," in its sole and absolute discretion, determine the suitability of the property for the option holder's use.  If the option holder found the property to be unsuitable for any reason, it could terminate the option agreement and the property owner would be required to refund the initial option consideration paid by the option holder.

35.     Although one or more of the optioned properties was not a suitable investment because, among other things, the structure of the amended options prevented the investments from providing benefit to the Capital Fund, the investments did not comply with the investment guidelines incorporated into the LPA and the option acquisition transactions were rife with conflicts of interest, Dunmore Capital (which controlled the option-holder SPEs) and its managers (the Dunmores) failed to declare the optioned properties unsuitable and demand rescission of the option acquisition transactions.

36.     Pursuant to Section 5.6.2 of the option agreements (even as amended), if the option purchaser discovered any material inaccuracy in any of the representations or warran-

_____

[7]     Each of the option agreements is substantially identical in all material respects.

ties made by the option seller, the option purchaser had the right to terminate the option agreement and demand the return of the initial option consideration paid by the option purchaser.

37.     In each of the option agreements (even as amended), the Dunmore-managed and controlled property-owning option seller represented to the Dunmore-managed and controlled SPE-option purchaser that there existed "no attachments, executions or assignments for the benefit of creditors, or voluntary or involuntary proceedings in bankruptcy or under any other debtor-relief laws pending, or to the best of [the option seller's] knowledge, threatened against [the option seller], which would prevent [the option seller] from performing its obligations under [the option agreement]."

38.     Upon information and belief, at the times that the SPEs entered into the option agreements with the Dunmore-managed and controlled property owners, events of default had been declared and notices of default had been publicly filed by one or more holders of liens on one or more of the optioned properties, and notices of delinquent taxes had been delivered to one or more of the property owners.  The SPE option purchasers were plainly aware of these circumstances because both they and the option sellers were managed, owned and/or controlled by the same individuals – the Dunmores.  This material inaccuracy in one or more of the option agreements would have entitled the SPE to deliver an "inaccuracy notice" to the relevant property owner pursuant to Section 5.4.9 of the option agreement, to request termination of the option agreement for the affected property and to demand a refund of the initial option payment delivered by the SPE to the property owner.

39.     Notwithstanding its right to do so under the option agreements, Dunmore Capital -- which controlled the option-holder SPEs -- failed to deliver inaccuracy notices to the owners of optioned properties which made material misrepresentations in their option agree-

ments, thus placing the Capital Fund's investment funds at risk, to the detriment of PfZW and in violation of its fiduciary duty to PfZW.

40.     Upon information and belief, Dunmore Capital failed to deliver the inaccuracy notices because doing so would have required the property-owning entities (all of which are managed, owned or controlled by the Dunmores themselves) to return the option payments which those entities desperately needed to pay down their indebtedness or tax delinquencies.

41.     Entry into the reckless option transactions also violated the so-called "keyman" provision of the LPA.  That provision (LPA Section 1.1) defines a "Keyman Event" as including, among others, the point in time that Sidney Dunmore or John Hartman (President of Dunmore Capital at the time the LPA was executed) is unable to perform his duties for the Capital Fund and the Advisory Committee has not provided Dunmore Capital, as general partner, with a waiver of Mr. Dunmore's or Mr. Hartman's inability to perform.  Section 1.1 of the LPA mandates that "[u]pon the occurrence of a Keyman Event the General Partner shall cease making any new Investments without the prior written approval of the Advisory Committee."

42.     Upon information and belief, John Hartman left the employ of the Dunmore entities and ceased being able to perform his duties for the Capital Fund on or about December 4, 2007.  (Dunmore Capital did not advise PfZW of Mr. Hartman's departure at the time that it occurred; rather, PfZW learned of it several weeks later.)  Upon Mr. Hartman's departure, Dunmore Capital, as general partner, was required to cease making any new investments of behalf of the Capital Fund without the prior written approval of the Advisory Committee.

43.     Nevertheless, six of the seven option transactions were closed after Mr. Hartman's departure from the Dunmore entities and Dunmore Capital never submitted any of these six transactions to the Advisory Committee for its consideration and approval.  The Advi-

sory Committee never gave Dunmore Capital its written approval for the Capital Fund to enter into any of these transactions.

C.  Dunmore Capital's Violation of the Investment Guidelines

44.     In Section 12.5(a) of the LPA, Dunmore Capital, as general partner of the Capital Fund, "represents, warrants and covenants to the Limited Partners that . . . (v) the General Partner shall comply at all times with the Investment Guidelines."

45.     The Investment Guidelines -- Schedule 4.1(a) to the LPA -- provide, in pertinent part:

> 5.  No more than forty percent (40%) of the aggregate Capital Commitments shall be invested in Investments that are distressed investments (for purposes of this provision "distressed investments" shall mean Investments in which the acquisition cost thereof by the Partnership shall not [*sic*] exceed one hundred ten percent (110%) of the then current fair market value thereof as reasonably determined by the General Partner).

> 6.  Land acquisition prices paid for an Investment by the Partnership shall not exceed at the time of the Partnership's acquisition thereof one hundred and ten percent (110%) of the then current fair market value thereof as farm land in its unentitled condition for residential development as reasonably determined by the General Partner.

46.     The Investment Guidelines were inserted into the LPA at PfZW's insistence as a means of protecting its investment in the Capital Fund and preventing Dunmore Capital (as general partner of the Capital Fund) and the Dunmores (as managers of the Capital Fund) from using the Capital Fund's assets to acquire overly-speculative investments.

47.     Upon information and belief, far more than 40% of the Capital Fund's assets were impermissibly invested at Dunmore Capital's sole direction in the acquisition of options on properties that are defined in the Investment Guidelines as "distressed investments" be-

cause the land acquisition prices included in the option agreements exceeded 110% of the then current fair market value of the interests to be acquired.

48.     Dunmore Capital also breached the LPA and its fiduciary duty to PfZW because the land acquisition prices agreed to be paid by the Capital Fund's SPEs were greater than 110% of the fair market value of the land as farm land in its unentitled condition as of the option acquisition dates.

D.  Dunmore Capital's Conflict of Interests

49.     Because PfZW was aware at the time that it entered into the LPA and the Feeder Fund Agreement that certain of the properties in which Dunmore Capital might elect to invest the Capital Fund's assets were managed, owned and/or controlled by the Dunmores, PfZW insisted that the LPA include a mechanism for evaluating and approving a transaction that might be tainted by a conflict of interest.  Thus, the parties established in the LPA an advisory committee composed, at the outset, of a member selected by PfZW and a member selected by Dunmore Capital.

50.     Section 12.3(b) of the LPA provides that:

> The General Partner shall not be required to obtain the consent or approval of the Advisory Committee prior to making any decision or taking any action whatsoever, except as follows:
>
> *   *   *
>
> (ii)     if the Advisory Committee determines that, based on the facts and circumstances at such time, any transaction or matter involving the Partnership may give rise to a conflict of interest between the Partnership, on the one had, and the General Partner or its Affiliates, on the other . . . .

51.     Although Dunmore Capital, as general partner of the Capital Fund, elected in its sole discretion to invest the Capital Fund's money in options to acquire properties which

are themselves managed, owned and controlled by the Dunmores -- a clear instance of a potential conflict of interest between the Capital Fund, on the one hand, and Dunmore Capital or affiliated entities, on the other -- Dunmore Capital never presented these transactions to the Advisory Committee for consideration, consent or approval. Neither did the Advisory Committee ever provide its consent or approval for any of the option acquisition transactions entered into by the SPEs using Capital Fund assets.

52.     Neither did Dunmore Capital, as general partner of the Capital Fund, present to the Advisory Committee for its consideration, consent or approval the addenda to the option agreements pursuant to which the SPEs-option purchasers agreed that the Capital Funds assets could be used to pay the debt service, property taxes and other loan administration expenses of the property-owning entities, without any credit towards the purchase price of the optioned properties.

E.   Dunmore Capital's Failure to Provide Financial Information

53.     In order to monitor and protect its substantial investment in the Feeder Fund and the Capital Fund, and as a result of its regulation by the Dutch government as a pension fund, PfZW required that Dunmore Capital, as general partner of the Capital Fund and as the managing member of the Feeder Fund, furnish PfZW with periodic financial reports regarding the financial affairs of those two entities.

54.     Accordingly, Section 7.1 of the LPA and Section 7.1 of the Feeder Agreement require Dunmore Capital, as general partner, to prepare and deliver to each partner certain audited and unaudited reports concerning the financial affairs of the Fund.

55.     Notwithstanding its express agreement to provide detailed reports, Dunmore Capital failed to provide PfZW with the required information and is now in default of its

obligations under the LPA and the Feeder Agreement to provide PfZW with, at least, the financial reports identified on Exhibit D, annexed hereto.

56.     On July 8, 2008, PfZW sent Dunmore Capital a written default notice identifying as events of defaults under the terms of the LPA and the Feeder Agreement those of the items listed above which were then due and owing to PfZW.

57.     Dunmore Capital failed to cure the defaults by providing PfZW with the required information and has provided no information since.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

58.     Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 to 58 of the Complaint as if fully set forth herein.

59.     Pursuant to Section 12.17 of the LPA, PfZW is a specifically recognized third-party beneficiary of the LPA, which is a valid contract between the Feeder Fund and Dunmore Capital.

60.     At all times herein, PfZW abided by and performed its obligations under the terms of the Feeder Fund Agreement.

61.     Pursuant to the LPA, Dunmore Capital was obligated to follow the Investment Guidelines.

62.     Dunmore Capital breached the LPA by failing to follow the Investment Guidelines.

63.     PfZW has suffered, and will continue to suffer, damages as a direct result of Dunmore Capital's breach of the LPA.

64.     As a result of Dunmore Capital's breach of contract, PfZW is entitled to money damages in an amount to be determined at trial but in no event less than $15 million.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract)

65.     Plaintiff repeats and re-alleges the allegations set forth in Paragraphs 1 to 58 of the Complaint as if fully set forth herein.

66.     Pursuant to Section 12.17 of the LPA, PfZW is a specifically recognized third-party beneficiary of the LPA, which is a valid contract between the Feeder Fund and Dunmore Capital.

67.     At all times herein, PfZW abided by and performed its obligations under the terms of the Feeder Fund Agreement.

68.     Pursuant to the LPA, Dunmore Capital was obligated to follow the LPA's procedures when a potential conflict of interests arose.

69.     Dunmore Capital breached the LPA by failing to present conflict of interest transactions to the Advisory Committee for consideration, consent or approval, and by entering into conflict of interest transactions without the consent or approval of the Advisory Committee.

70.     PfZW has suffered, and will continue to suffer, damages as a direct result of Dunmore Capital's breach of the LPA.

71.     As a result of Dunmore Capital's breach of contract, PfZW is entitled to money damages in an amount to be determined at trial but in no event less than $15 million.

## THIRD CLAIM FOR RELIEF
### (Breach of Contract)

72.     Plaintiff repeats and re-alleges the allegations set forth in Paragraphs 1 to 58 of the Complaint as if fully set forth herein.

73.     Pursuant to Section 12.17 of the LPA, PfZW is a specifically recognized

third-party beneficiary of the LPA, which is a valid contract between the Feeder Fund and Dunmore Capital.

74.     At all times herein, PfZW abided by and performed its obligations under the terms of the Feeder Fund Agreement.

75.     Pursuant to the LPA, Dunmore Capital is required to provide PfZW with certain specified audited and unaudited reports concerning the financial affairs of the Capital Fund.

76.     Dunmore Capital breached the LPA by failing to provide PfZW with the required audited and unaudited reports concerning the financial affairs of the Capital Fund.

77.     As a result of Dunmore Capital's breach of contract, PfZW is entitled to judgment directing Dunmore Capital to turn over to PfZW all audited and unaudited reports concerning the financial affairs of the Capital Fund to which PfZW is entitled under the terms of the LPA.

## FOURTH CLAIM FOR RELIEF
### (Breach of Contract)

78.     Plaintiff repeats and re-alleges the allegations set forth in Paragraphs 1 to 58 of the Complaint as if fully set forth herein.

79.     The Feeder Fund Agreement is a valid contract between PfZW, Dunmore Capital and Dunmore Land Development, LLC.

80.     At all times herein, PfZW abided by and performed its obligations under the terms of the Feeder Fund Agreement.

81.     Pursuant to the Feeder Fund Agreement, Dunmore Capital is required to provide PfZW with certain audited and unaudited reports concerning the financial affairs of the Feeder Fund.

82.     Dunmore Capital breached the Feeder Fund Agreement by failing to provide PfZW with the required audited and unaudited reports concerning the financial affairs of the Feeder Fund.

83.     As a result of Dunmore Capital's breach of contract, PfZW is entitled to judgment directing Dunmore Capital to turn over to PfZW all audited and unaudited reports concerning the financial affairs of the Feeder Fund to which PfZW is entitled under the terms of the Feeder Fund Agreement.

### FIFTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty)

84.     Plaintiff repeats and re-alleges the allegations set forth in Paragraphs 1 to 58 of the Complaint as if fully set forth herein.

85.     As the general partner of the Capital Fund, Dunmore Capital owed a fiduciary duty to PfZW, as the limited partner of the Capital Fund.

86.     Dunmore Capital invested the Capital Fund's assets in properties owned by entities that were managed, owned and/or controlled by the Dunmores.

87.     Upon information and belief, at all times, Dunmore Capital knew that the property-owning entities were unable to service their debt and that the Capital Fund's assets were to be used and were in fact used to pay obligations that did not belong to the Capital Fund but, rather, belonged to other entities owned or controlled by the Dunmores.

88.     In doing so, Dunmore Capital breached its fiduciary duties to PfZW and to the Capital Fund.

89.     As a result of Dunmore Capital's breach of fiduciary duty, PfZW is entitled to money damages in an amount to be determined at trial, but in no event less than $15 million.

## SIXTH CLAIM FOR RELIEF
### (Aiding and Abetting a Breach of Fiduciary Duty)

90.     Plaintiff repeats and re-alleges the allegations set forth in Paragraphs 1 to 58 of the Complaint as if fully set forth herein.

91.     As the general partner of the Capital Fund, Dunmore Capital owed a fiduciary duty to PfZW, as the limited partner of the Capital Fund.

92.     Dunmore Capital breached its fiduciary duty to PfZW.

93.     Sidney and Jeremy, as managers and controlling principals of Dunmore Capital, the Feeder Fund, Dunmore Land Development, LLC, and the optionors and optionees described above, knowingly caused, aided and abetted Dunmore Capital to breach its fiduciary duties to PfZW.

94.     As a result of the actions of Sidney and Jeremy, and each of them, PfZW is entitled to money damages in an amount to be determined at trial, but in no event less than $15 million.

## SEVENTH CLAIM FOR RELIEF
### (Unjust Enrichment)

95.     Plaintiff repeats and re-alleges the allegations set forth in Paragraphs 1 to 58 of the Complaint as if fully set forth herein.

96.     As a result of the conduct set forth above, Defendants have been unjustly enriched and, as a matter of equity, should be required to disgorge and to remit to PfZW all sums unlawfully obtained from PfZW.

WHEREFORE, PfZW respectfully prays for:

(a)     On the First Claim for Relief, for a judgment against defendant Dunmore Capital in an amount to be determined at trial; and

(b)     On the Second Claim for Relief, for a judgment against defendant Dunmore Capital in an amount to be determined at trial; and

(c)     On the Third Claim for Relief, for a judgment against defendant Dunmore Capital directing Dunmore Capital to turn over to PfZW all audited and unaudited reports concerning the financial affairs of the Capital Fund to which PfZW is entitled under the terms of the LPA; and

(d)     On the Fourth Claim for Relief, for a judgment against defendant Dunmore Capital turn over to PfZW all audited and unaudited reports concerning the financial affairs of the Feeder Fund to which PfZW is entitled under the terms of the Feeder Fund Agreement; and

(e)     On the Fifth Claim for Relief, for a judgment against defendant Dunmore Capital in an amount to be determined at trial; and

(f)     On the Sixth Claim for Relief, for judgment against defendants Sidney and Jeremy, and each of them, in an amount to be determined at trial;

(g)     On the Seventh Claim for Relief, for disgorgement of and remission to PfZW of all amounts proved at trial to have been unlawfully and inequitably obtained from PfZW;

(h)     Imposition of a constructive trust for PfZW's benefit over the Dunmores' interests in properties or entities;

(i)     Interest on the judgment, and the costs, attorneys' fees, and disbursements of this action; and

(j) Such other relief as the Court may deem just and proper.

## Demand for Jury Trial

Plaintiff hereby demands a jury trial on all issues so triable.

OF COUNSEL:

Peter C. Neger
Patrick Fang
BINGHAM McCUTCHEN LLP
399 Park Avenue
New York, New York  10022-4689
(212) 705-7000

*M. Duncan Grant*

M. Duncan Grant (Del. Bar No. 2994)
Maria L. Panichelli (Del. Bar No. 5047)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, Delaware  19899-1709
(302) 777-6500

Dated:  August 13, 2009

*Attorneys for Plaintiff Stichting*
*Pensioenfonds Zorg en Welzijn*

11347578